```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW HAMPSHIRE
```

**Cynthia J. Salisbury**

    **v.**                                    Case No. 09-cv-224-PB
                                                  Opinion No. 2010 DNH 132

**Assurant Employee Benefits**


## MEMORANDUM AND ORDER

Cynthia J. Salisbury brings an Employee Retirement Income Security Act ("ERISA") action against Assurant Employee Benefits ("Assurant") seeking (1) repayment of withheld long-term disability benefits and (2) reinstatement of her monthly benefit payments. See 29 U.S.C. § 1132(a)(1)(B). Assurant has withheld payments in order to recoup alleged overpayments. Both Salisbury and Assurant have moved for judgment on the administrative record. For the reasons given below, I grant Assurant's motion and deny Salisbury's motion.

## I. Background

The issue here is whether Assurant properly withheld benefits after it concluded that it had overpaid Salisbury because it had been unaware that her payments from the Social Security Administration ("SSA") had increased. The facts

recounted here are only those relevant to the present dispute.

**A.   The Relevant Policy Provisions**

In 1986, Salisbury began working at St. Joseph Hospital and became insured under a group long-term disability ("LTD") policy provided by the Mutual Benefit Life Insurance Company.[1]  (Joint Statement of Material Facts ("JSMF"), Doc. No. 11, ¶¶ 1-2.) Under the policy, an individual who becomes disabled and has no source of income except for the LTD insurance payments receives 60% of her previous monthly earnings, or the "[s]chedule [a]mount," each month.  See Admin. R. at 7, 14.  If the individual receives additional payments while disabled, such as Social Security or workers' compensation payments, and those payments increase the person's total income to more than 70% of her previous earnings (the "[m]onthly [p]ayment [l]imit"), the LTD benefit will be decreased until the individual's total income does not exceed the monthly payment limit.  Id. at 17.  The LTD payments, however, will not be decreased if a person's Social Security payments increase solely due to automatic cost-of-living

---

[1] The Mutual Benefit Life Insurance Company is now known as Union Security Insurance Company, which is an Assurant subsidiary.  (Joint Statement of Material Facts, Doc. No. 11, at 1 n.1; Plaintiff's Statement of Material Facts, Doc. No. 6, at 2.)

adjustments.  Id. at 19.

In addition, the policy specifies that the insurer has the right to recoup overpayments, either by requiring repayment from the insured in a lump sum or by reducing or eliminating future benefit payments.  Id.  The policy explains how it will allocate any lump-sum payments that the insured receives when determining if there has been an overpayment:

> If the [p]erson [i]nsured has received a one-sum payment from any of the above sources, the one-sum payment will be allocated as if the [p]erson [i]nsured had received it on a periodic basis.

Id.  In addition, the policy notes,

> We will rely on data from the source making the one-sum payment to determine the manner and amounts of the allocation.  We will be saved harmless from acting on such data.  If all necessary data has not been given to [u]s, the allocation will be determined solely by [u]s.  The allocation will then be based on probable assumptions as to the nature and purpose of the one-sum payment.

Id.

**B.  Salisbury's Receipt of Benefits**

After becoming disabled in December 1988, Salisbury filed for LTD benefits.  (JSMF, Doc. No. 11, ¶¶ 1, 3.)  Her claim was approved effective December 1990, and her monthly benefit was set at $1665.  (Id. ¶ 4.)  At that time, she also applied for Social Security Disability ("SSD") benefits, and the SSA awarded her

benefits effective December 1990.  (Id. ¶ 5); see also Admin. R. at 878 (explaining that Salisbury's SSD benefits were awarded retroactively in 1993).  Because Salisbury was receiving workers' compensation payments, her monthly SSD benefit was reduced from $974.10 to $163.  (JSMF, Doc. No. 11, ¶ 14.)

In 1995, Salisbury received a lump-sum workers' compensation settlement of $80,000.  See Admin. R. at 438, 440.  After receiving notice of this settlement, Assurant contacted Salisbury in order to determine whether her SSD benefit had increased given that the SSA was no longer taking her workers' compensation payments into account.  See id. at 878-79.  According to Assurant, Salisbury replied that the SSA had informed her that her SSD benefit would remain constant for the next eight years. See id. at 879.  Assurant periodically requested information from Salisbury regarding her SSD payments to ensure that it was offsetting her LTD payment by the proper amount, and had no reason to believe that Salisbury's SSD payments, not including cost-of-living adjustments, were increasing.  See id.

In April 2003, approximately eight years after the workers' compensation settlement, Assurant requested authorization to obtain additional information from the SSA, but received no response.  See id.  After repeating this request in July 2003,

Assurant finally received a response from Salisbury in September 2005.  See id.  At that point, according to Assurant, Salisbury indicated that she was receiving a much larger SSD benefit than she had previously reported.  See id.

Assurant eventually learned that Salisbury had received three lump-sum payments from the SSA:  $9,835 in August 1997, $27,676 in July 2001, and $10,819 in August 2001.  See id. at 828-29.  The SSA made these payments because it belatedly realized that it should have increased Salisbury's monthly benefit starting in 1995, after her workers' compensation settlement.  (See Def.'s Mot. for J., Doc. No. 12, at 3.) Salisbury's Member Beneficiary Record, which Assurant received from the SSA, shows that the SSA allocated the lump-sum payments as if Salisbury's SSD benefit had increased in October 1995.  See Admin. R. at 823 (a copy of Salisbury's Member Beneficiary Record); id. at 813 (referring to the relevant document as a Member Beneficiary Record); (Def.'s Mot. for J., Doc. No. 12, at 3 n.1 (explaining that the increase reflected in the Member Beneficiary Record in 1995 is not a cost-of-living adjustment)).

Once Assurant discovered Salisbury's increased monthly SSD benefit and previous lump-sum payments, it recalculated the LTD benefit that it should have been paying her.  Assurant determined

that if it had properly taken into account the additional Social Security payments, Salisbury would have received $99,852.08 less in LTD payments.  (See JSMF, Doc. No. 11, ¶ 15); Admin. R. at 835.

In order to recoup this overpayment, Assurant began witholding payments from Salisbury in September 2006.  See Admin. R. at 880.  Salisbury disputed Assurant's overpayment calculation in two administrative appeals in 2007 and 2009, but was denied relief each time.  (See JSMF, Doc. No. 11, ¶¶ 16-21); Admin. R. at 910-912, 812-814.  Following these appeals, Salisbury sued in New Hampshire state court, and the defendants removed the case to this court.  (See JSMF, Doc. No. 11, ¶¶ 23-24.)

## II.  Standard of Review

Where an ERISA benefits plan gives its administrator discretion to decide whether an employee is eligible for benefits, "the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion."  Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (internal quotation marks omitted); see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If, however, an ERISA benefits plan does not vest discretion in the

plan administrator, the administrator's decision must be reviewed de novo. See Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 6 (1st Cir. 2009) (citing Firestone, 489 U.S. at 111-12).

Assurant contends that the policy here grants it discretion "with respect to calculating benefit overpayments." (Def.'s Mot. for J., Doc. No. 12, at 6-7.) The policy, however, does not include language that clearly vests discretionary authority to interpret the terms of the policy in the plan administrator. Cf., e.g., Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002) (concluding that administrator had discretionary authority where plan, among other things, gave administrator "the exclusive right, in [its] sole discretion, to interpret the Plan and decide all matters arising thereunder" (alteration in original)); Rivera Sanfeliz v. Chase Manhattan Bank, 459 F. Supp. 2d 114, 119 (D.P.R. 2006) (concluding same where plan provided that administrator had "sole responsibility and complete discretion to interpret all terms and provisions of the [p]olicy and to decide any matters in connection with the [p]olicy"). Because I would rule in Assurant's favor even under the de novo standard of review, I need not take up this issue. Instead, I assume, without deciding, that the de novo standard is appropriate here.

### III. Analysis

Salisbury's primary argument is that Assurant should have allocated each lump-sum SSD payment as if it were paid out over the course of the months following the payment rather than over the course of the months preceding the payment. Thus, for example, when Assurant learned that Salisbury, in August 1997, had received a lump-sum payment of $9,835, it should have divided that amount over the remaining 204 months[2] in her policy and treated the payment as if the SSA had paid her $48.21 every month in additional benefits since the lump-sum payment and would continue to pay her that additional amount each month until 2015. (See Pl.'s "Actual Reconciliation" Spreadsheet, Doc. No. 11-3, at 22; Pl.'s Opp'n to Def.'s Mot. for J., Doc. No. 16, at 4.) Assurant responds that Salisbury's calculations are based on an incorrect interpretation of the policy.

The terms of an ERISA policy "must be interpreted under principles of federal common law," which require courts to "accord an ERISA plan's unambiguous language its plain and

---

[2] Because Salisbury became disabled before the age of sixty, her benefits were payable either for the duration of her disability or until the day before her sixty-fifth birthday. See Admin. R. at 42 (form noting Salisbury's date of birth as July 7, 1950); id. at 5, 7 (policy provisions explaining duration of benefits). Salisbury's calculations assume that she would never recover from her disability.

ordinary meaning." Forcier v. Metro. Life Ins. Co., 469 F.3d 178, 185 (1st Cir. 2006); see also Balestracci v. NSTAR Elec. and Gas Corp., 449 F.3d 224, 230 (1st Cir. 2006); Rodriquez-Abrea v. Chase Manhattan Bank, N.A., 986 F.2d 580, 586 (1st Cir. 1993); Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989). "The question of whether an ERISA plan term is ambiguous is generally a question of law . . . ." Balestracci, 449 F.3d at 230. "[C]ontract language," including the language in an ERISA policy, "is ambiguous if the terms are inconsistent on their face, or if the terms allow reasonable but differing interpretations of their meaning." Rodriquez-Abreu, 986 F.2d at 586.

Here, the parties dispute the meaning of the following provision regarding the allocation of one-sum benefits:

> If the [p]erson [i]nsured has received a one-sum payment from any of the above sources, the one-sum payment will be allocated as if the [p]erson [i]nsured had received it on a periodic basis.

Admin. R. at 19. Salisbury claims that this provision is ambiguous, and that this court should resolve the ambiguity in her favor and require Assurant to divide her lump-sum Social Security payments over the months following each lump-sum payment. (See Pl.'s Opp'n to Def.'s Mot. for J., Doc. No. 16, at 1, 4.) She reasons that "it would be totally inconsistent with

[her] reasonable expectations of coverage that [she] should be penalized in 1995 for money [she] did not actually receive – or even know [she] was entitled to receive – until 2001." (Id. at 4.)  Salisbury suggests that if Assurant wanted to reserve the right to calculate the benefits in the manner it did, it should have included the word "retroactively" before "allocated" in the relevant provision.  (See id. at 4-5.)  Assurant, on the other hand, claims that this provision is unambiguous and entitles it to retroactively allocate the lump-sum payments exactly as the SSA had allocated them – i.e., as if portions of each payment were received in the months preceding the lump-sum payment. (Def.'s Mot. for J., Doc. No. 12, at 7-10.)

In the context of the policy, the relevant provision is unambiguous and therefore must be given "its plain and ordinary meaning."  Forcier, 469 F.3d at 185.  To allocate a payment "as if the [p]erson [i]nsured had received it on a periodic basis" clearly means to allocate the payment "as if the insured had received portions of the payment periodically prior to the payment," not "as if the insured (1) had received portions of the payment periodically starting in the month of the payment, and (2) would continue to receive portions of the payment throughout the remainder of the policy term."  It would be illogical to

allocate the lump-sum payments according to Salisbury's method because she is not even guaranteed to receive LTD payments for a set period of time; under the terms of the policy, since she became disabled before reaching age sixty-five, she will receive benefits until the earlier of (1) the day her disability ends or (2) the day before her sixty-fifth birthday.  See Admin. R. at 5, 7.

    Salisbury's interpretation of the relevant provision is also clearly incorrect for a second, independent reason.  Immediately after the policy states that "the one-sum payment will be allocated as if the [p]erson [i]nsured had received it on a periodic basis," it explains that the insurer "will rely on data from the source making the one-sum payment to determine the manner and amounts of the allocation."  Id. at 19.  If Salisbury were correct about the meaning of the first provision, it would be nonsensical to include the second provision in the policy because Assurant would neither need, nor be permitted, to rely on source data in allocating lump-sum payments.  Assurant's allocation of Salisbury's lump-sum payments was therefore correct.[3]

---

    [3] Salisbury makes a related argument that Assurant relied on an incorrect record from the SSA -- her Member Beneficiary Record -- in allocating her lump-sum Social Security payments.  (See

Although Salisbury does not specifically challenge Assurant's subsequent actions, I note that those actions were also proper. After correctly allocating Salisbury's lump-sum payments, Assurant retroactively reduced Salisbury's LTD benefits such that her total income would be no greater than 70% of her previous employment income. This reduction was in complete accordance with the terms of the policy. See id. at 17. Finally, having concluded that Salisbury had previously been overpaid, Assurant properly eliminated Salisbury's future payments in order to recoup the overpayment. See id. at 19.

## IV.  Conclusion

For all of the foregoing reasons, I grant Assurant's motion for judgment on the administrative record (Doc. No. 12) and deny

---

Pl.'s Opp'n to Def.'s Mot. for J., Doc. No. 16, at 3.)  Even if this record were incorrect, Assurant would prevail because, under the terms of the policy, Assurant is "saved harmless from acting on" records from the source making the lump-sum payments even if those records are incorrect. Admin. R. at 19.

I need not, however, rely on that provision. Salisbury's primary argument about why the Member Beneficiary Record is incorrect is that it does not show how much the SSA actually paid her during the relevant months. (See Pl.'s Opp'n to Def.'s Mot. for J., Doc. No. 16, at 3.)  The fact that the record does not reflect when the amounts were actually received, but instead shows how the SSA retrospectively allocated the lump-sum payments, does not make it incorrect.

Salisbury's motion (Doc. No. 15.)  The clerk is directed to enter judgment and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

August 6, 2010

cc: Christopher P. Flanagan, Esq.
    Cynthia J. Salisbury